David CRUZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–03–00313–CR.

Court of Appeals of Texas, El Paso.

Feb. 17, 2005.

Discretionary Review Granted Sept. 28, 2005.

M. Clara Hernandez, El Paso County Public Defender, El Paso, for Appellant.

Jaime E. Esparza, Dist. Atty., El Paso, for State.

Before Panel No. 2 BARAJAS, C.J., McCLURE, and CHEW, JJ.

## OPINION

DAVID WELLINGTON CHEW, Justice.

Appellant David Cruz appeals his conviction for capital murder. Over Appellant's not guilty plea, the jury found Appellant guilty of the offense. He was sentenced to life imprisonment. We reverse the trial court's judgment and the case is remanded for a new trial.

On May 18, 2002, the body of Mike Mendivil was found near Capistrano Park on a dirt road by a cotton field in the Lower Valley area of El Paso. An autopsy revealed that the victim had four stab wounds, none of which were fatal, but he had died from multiple blunt force injuries to his chest and abdomen—injuries sustained when he was run over by an automobile. That same day, Mendivil's damaged pickup truck was found abandoned at a different park near Henderson and Pendale Streets. There was damage to the vehicle's rear bumper and bloodstains on the vehicle's exterior, interior, and the undercarriage.

The police obtained an arrest warrant for Appellant. After he was arrested, Appellant gave a voluntary statement to the police. According to his statement, on the day of the incident, he went to the La Bamba Bar on Alameda around 6 p.m. At approximately 10:30 p.m., Mendivil, walked up to the bar and stood next to Appellant while ordering a beer. Mendivil made sexual advances towards Appellant, which Appellant rejected. Mendivil walked away to the opposite end of the bar. Appellant's friend told him that Mendivil was "known for that." Appellant told his friend that he was going to leave because Mendivil had offended him and he did not feel comfortable being there.

As Appellant was walking home, Mendivil drove up in his pickup truck. Mendivil asked Appellant if he wanted a ride home. Mendivil agreed to take Appellant straight home, but started driving in a different direction than Appellant had requested. Mendivil kept driving even though Appellant had told him to drop him off.

Mendivil drove to an area by some cotton fields and stopped the truck. Appellant tried to jump out of the truck, but could not. Appellant noticed that Mendivil had unzipped his pants and was moving towards him. Mendivil tried to grab his "front area" and tried to take off Appellant's pants. Appellant stated that he felt like crying because he could not get Mendivil off of him. Appellant told Mendivil to get off of him or he would hit him, but Mendivil did not stop his attack. Appellant felt very scared and worried that he would be killed. Appellant hit Mendivil several times, but Mendivil continued to come at him. Appellant remembered that he had a knife in his pocket. Appellant took it out and stabbed Mendivil twice in the rib area. The struggle continued outside and Appellant stabbed Mendivil again. Mendivil fell down and Appellant got into the truck. As Appellant was backing out of the area, he noticed that he had hit Mendivil. Appellant drove forward so as not to hit Mendivil again and then backed out of the area in reverse.

As Appellant was driving in reverse, he struck a cement barrier and the truck was stuck there. Two guys from a nearby house came up and offered to help, but were unable to get the truck unstuck. Their father brought over some ramps and a jack and they got the truck off the barrier.

Appellant admitted in his statement that he had taken Mendivil's keys, sunglasses, and a souvenir from the truck and that those items were in a trash bag outside his house. Appellant also admitted to taking Mendivil's cell phone, but did not know where he had left it. Appellant stated that he had never talked to Mendivil before that night, but had seen him around at the La Bamba Bar. He only knew the guy's name was Mike because he recalled seeing an ID card inside the truck.[1]

At trial, the State called several witnesses who were in the park area on the night of the incident. Javier Lopez testified that he was visiting with friends that evening when he heard a crash and saw a pickup truck stuck on a curb. He and his friend "Tury" went over to the truck and tried to help dislodge it. Lopez asked Appellant why there was blood on his shirt and his arms. Appellant told him that he had picked up a girl at a club, had bought some beer, had taken her to some street in that area, and found out that the girl was actually a guy. Appellant told Lopez that he got mad and started beating up the guy. Lopez recalled that Appellant told him he had pulled the guy out of the truck and started beating him up and then a car came by and picked up the guy. Lopez also recalled that Appellant asked them to go partying with him. Eventually, they were able to get the truck unstuck after Tury's father arrived with a jack and ramps. Appellant then thanked them and left in the truck.

Arturo Casillas, Jr. testified that he heard the crash and saw the truck hit the curb while it was driving in reverse. He and Lopez went over to help. He recalled that Appellant offered them beer from the truck, which they hid behind some bushes or a tree. Casillas, Jr.'s father arrived after they had hid the beer. The three of them tried to push the truck while Appellant pressed the gas pedal, but the truck remained stuck. Casillas, Jr. recalled that his father asked Appellant about the blood on his shirt and Appellant said, "I got in a fight with my friend," but after his father left to get the jack and the ramps, Appellant told Casillas, Jr., "he stabbed some— it was a guy because he thought it was a chick and he was defending HIMSELF because he didn't like that stuff and he didn't know what to do."[2] Appellant told him that after stabbing the guy, Appellant pushed the guy out of the truck and left. Appellant also told Casillas, Jr. that the truck belonged to him and that he had recently bought it.

April Saladin, another witness in the group of friends, testified that while they were outside in front of her cousin's house,

1. At trial, Appellant stipulated that blood found on his clothing contained Mendivil's DNA, that blood from the driver's seat and door of Mendivil's truck contained Mendivil's DNA, that blood on the steering wheel contained both Appellant's and Mendivil's DNA, and that a cigarette butt found inside an ashtray in the vehicle contained Appellant's DNA.

2. Arturo Casillas, Sr. also testified at the trial. He stated that when he went to pick up his son that evening, he saw his son over by a truck that was stuck. When he asked the driver of the truck about the bloodstain on his shirt, Arturo, Sr. recalled that the driver said, "he got into a fight with his homie." According to Arturo, Sr., Appellant looked normal and did not appear nervous when he told him about the fight. Appellant told Arturo, Sr. that it was his mother's truck.

she saw the truck drive by. Saladin saw two people in the truck. The driver was wearing a dark cap and a checkered shirt. Saladin later saw the same pickup truck, but only the driver was in the truck. When she saw the truck the second time, the driver was reversing out really fast and hit a concrete barrier.

Appellant raises ten issues on appeal, however, we find that Issue Six is dispositive, and will therefore, address this complaint first. In his sixth issue, Appellant asserts that the trial court erred in not granting a mistrial because the prosecutor's alleged comment on the defendant's failure to testify during closing argument.

■ A defendant has a state and federal constitutional right not to be a witness against himself. *See* U.S. CONST. AMEND. V; TEX. CONST. art. I, § 10. It is well established that the failure of an accused to testify may not be the subject of comment by the prosecution. *Bustamante v. State,* 48 S.W.3d 761, 765 (Tex.Crim.App.2001). Such comments violate the privilege against self-incrimination contained in Article I, § 10 of the Texas Constitution and the Fifth Amendment to the United States Constitution and also offend the provisions of TEX.CODE CRIM.PROC.ANN. art. 38.08 (Vernon 1979)("[T]he failure of any defendant to ... testify shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause.").

■ To determine whether a prosecutor's comment was an improper comment on Appellant's failure to testify, we must consider whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily consider it to be a comment on the failure of the accused to testify. *Bustamante,* 48 S.W.3d at 765. The comment must be viewed from the jury's standpoint and the implication that the comment referred to the defendant's failure to testify must be clear. *Id.* It is not sufficient that the language might be construed as an implied or indirect allusion to the accused's right to remain silent. *Id.; Patrick v. State,* 906 S.W.2d 481, 490 (Tex.Crim.App. 1995), *cert. denied,* 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996).

■ Appellant objected to the complained-of comments and the trial court sustained the objection. Appellant then moved for a mistrial and the trial court denied the motion. If a trial court sustains an objection to improper jury argument, the complaining party must request an instruction to disregard to preserve error on appeal if an instruction to disregard could have cured the prejudice resulting from the argument. *McGinn v. State,* 961 S.W.2d 161, 165 (Tex.Crim.App.), *cert. denied,* 525 U.S. 967, 119 S.Ct. 414, 142 L.Ed.2d 336 (1998). If, on the other hand, the prejudice arising from an erroneous jury argument was incurable, a defendant would be required to request a mistrial to preserve error on appeal because a mistrial would be the appropriate remedy. *Id.; see also Cockrell v. State,* 933 S.W.2d 73, 96–97 (Tex.Crim.App.1996)(concurring, Maloney, J.)("When an objection is made, followed by a motion for mistrial in the case of argument that is so inflammatory that an instruction to disregard would be of no value, Rule 52(a) [now Tex.R.App.P. 33.1] has been satisfied."). Thus, in determining whether Appellant preserved error on this issue, we must determine whether the jury argument, if erroneous, was also incurable.

■ The following exchange occurred during the prosecutor's closing argument:

[Prosecutor]: They want to say first that it's self-defense. Well, in order to have self-defense, what has to happen is someone says, 'Yeah, I commit-

ted this crime. I committed this murder. I did this and I intended to do this because I was in fear of my life.'

[Defense]: Your Honor, we object. That is, number one, a comment on the Defendant's right to remain silent. Number two, that is not the law. You can deny it. You can say it was an accident and still say you acted in self-defense, and Counsel knows that's the law. We demand a mistrial.

[Court]: Your objection is sustained. Your Motion for Mistrial is denied.

[Prosecutor]: That's the gist of the self-defense. I had to do this because I was in fear of my life. Look at it. It's in your charge.

Appellant asserts that the prosecutor's comment is a blatant example of an improper comment on the defendant's failure to testify, in that the prosecutor literally stated that the defendant must testify that he was in fear of his life. We agree.

The Court of Criminal Appeals has held that use of the word "I" in a prosecutor's jury argument may constitute harmful error. *See Cook v. State,* 702 S.W.2d 597, 599 (Tex.Crim.App.1984); *Cherry v. State,* 507 S.W.2d 549, 550 (Tex.Crim.App.1974). In *Cherry v. State,* the prosecutor argued, " 'Now what defenses are available to a person in a case like this? Number one, alibi, *I* was somewhere else, *I* was with someone else.' " *Cherry,* 507 S.W.2d at 550. [Emphasis added]. The *Cherry* Court found that the choice of the word "I" contradicted any theory that the prosecutor was referring to witnesses other than the defendant. *Id.* Likewise, in *Cook v. State,* the Court determined the following comments constituted reversible error:

I told you first of all there are several defenses we usually heard. A., would be mistaken identity. They couldn't do that because everybody identified him. B., using the alibi. Someone else, be-

cause '*I* was somewhere else. *I*'ve got my alibi, because *I* was playing poker with the guys.' It wasn't that. Again, because all of the evidence involved. C., consent. There was no affirmative consent shown as to what happened during the attack. Only innuendoes and suppositions about what may have happened. [Emphasis in original].

*Cook,* 702 S.W.2d at 598.

Examining the comment from the jury's standpoint, the *Cook* Court stated, "[w]hen the word 'I' is used in reference to something the defendant might have testified to, but did not, it is illogical to think that the jury is not reminded of the defendant's failure to testify." *Cook,* 702 S.W.2d at 599. We find no meaningful distinction between the blatant and direct reference to evidence that could only have been supplied by Appellant in this case and the improper comments that were found deplorable in *Cherry* and *Cook.* Here, the use of the word "I" in the prosecutor's argument directed the jury's attention to Appellant's election not to testify in this case, in particular, on the issue of self-defense, which was a subject that only defendant could have testified to in context of the evidence presented by the State. The prosecutor's comment undoubtedly pointed to a lack of evidence that could only have come from Appellant, and therefore was improper. *See Swallow v. State,* 829 S.W.2d 223, 225 (Tex.Crim.App.1992); *Angel v. State,* 627 S.W.2d 424, 426 (Tex. Crim.App.1982).

■ Ordinarily, an instruction to disregard cures an improper comment on a defendant's failure to testify. *See Long v. State,* 823 S.W.2d 259, 269–70 (Tex.Crim. App.1991), *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). The inquiry is whether the argument was extreme, manifestly improper, injected new

and harmful facts into the case, or violated a mandatory statutory provision and was so inflammatory that an instruction to disregard could not cure its prejudicial effect. *Id.* at 267. Article 38.08 prohibited the prosecutor from commenting on Appellant's decision not to testify. *See* Tex. Code Crim.Proc.Ann. art. 38.08. We find that the use of the word "I" left no doubt in the jury's mind that the prosecutor was passing judgment on Appellant's failure to testify and as such was inflammatory, flagrant, and its prejudicial effect was therefore incurable. Thus, the trial court erred in denying Appellant's motion for mistrial.

### Harm Analysis

■ Having determined that the State's argument constituted an improper comment on Appellant's failure to testify, we must conduct a harm analysis under Tex.R.App.P. 44.2. *See Madden v. State,* 799 S.W.2d 683, 699–700 (Tex.Crim.App. 1990); Tex.R.App.P. 44.2(a). We apply a constitutional harm analysis in situations where the State comments on a defendant's failure to testify and we must reverse a judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction. *See* Tex.R.App.P. 44.2(a); *Wimbrey v. State,* 106 S.W.3d 190, 192 (Tex.App.-Fort Worth 2003, pet. ref'd).

■ In applying this standard, we do not consider whether there is overwhelming evidence of guilt. *Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989). Instead, we focus on the error and whether the error might have prejudiced the jurors' decision-making. *Id.* We must examine the source of the error, the nature of the error, whether or to what extent it was emphasized by the State, and its probable collateral implications. *Id.* at 587. Further, we must also determine whether declaring the error harmless would en-

courage the State to commit the error again with impunity. *Id.*

Here, the source of the error was the State and error was constitutional in nature as well as a statutorily protected right of Appellant. The only disputed issue in this case was the intent of Appellant, that is, his culpable mental state when he hit the victim with the pickup truck. This case turned in large part on the issue of self-defense. Evidence of this claim was introduced by the State in the form of Appellant's voluntary statement, which was taken shortly after the incident. There were no witnesses to the incident— thus, the prosecutor's comment may have weighed heavily on the jury's decision-making on the issue of self-defense. We find that the improper comment probably had collateral implications beyond mere forceful closing argument. While the State did not emphasize the improper comment beyond use of the "I" pronoun again after the motion for mistrial was denied, we find that in declaring the error harmless, the State would be encouraged to make such arguments with impunity. For these reasons, we cannot determine beyond a reasonable doubt that the error did not contribute to Appellant's conviction. Issue Six is sustained. Finding that Issue Six constitutes reversible error, we do not reach Appellant's remaining issues.

We reverse the trial court's judgment and remand for a new trial.